

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

UNITED STATES OF AMERICA,
*Plaintiff,*

v.

DANA ANN WILKEY,
*Defendant.*

Case No. 1:17-TP-20049-UU-1
*USM Number: 05439-104*
Before Judge Ursula Ungoro

[CAND: 5:14-CR-0318-LHK]

**DEFENDANT'S REPLY
IN RE: GOVERNMENT'S
OPPOSITION TO EARLY
TERMINATION OF
PROBATION [D.E. 3]**

**NOW COMES** DANA ANN WILKEY, replying *in propria persona* (*pro se*) to the government's opposition to my request that this Court terminate the remaining portion of my supervised release. This reply is timely under Local Rule 7.1.

**The Government's Position**

1. The government begins by stating that I requested this release base solely on compliance, tolling so far, and my involvement in various community activities. [D.E. 3: 2].

2. The government then proceeds to cite the requirements of §3583(e) and *Johnson v. United States*, 529 U.S. 694, 708 (2000) as the legal standard by which this court should determine my request. [D.E. 3: 3]

3. The government then argues that "Section 3583 does not provide for early

termination based solely on a defendant's compliance with the terms of his supervision." stating that neither my conduct, nor the interests of justice are served by terminating my probation before it's full term is expired.

4. The government's only substantive argument to keep me on further supervision comes from page 5, wherein Miss López argues that the length of my probation is necessary to ensure payments are made toward the restitution that is part of my original judgment.

5. Finally, Miss López argues that I "cite[d] no other facts establishing extraordinary circumstances that would suggest this is an exceptional case warranting early termination..."

**My Reply to the Government's Position**

6. This will be somewhat of a point-by-point rebuttal to the government's position in opposition to my request.

7. To begin, the statute by which termination of probation is decided (18 U.S.C. §3564(c)) is different than the one used to determine if early termination of supervised release is warranted (18 U.S.C. §3583(e)). For probation, this court considers "the factors set forth in section 3553(a) to the extent that they are applicable..." See §3564(c). While, conversely, this court is directed to consider only eight of the factors from sentencing when determining whether to let a defendant on supervised release go early. See §3583(e).

8. The difference here is that this Court, so long as it is warranted by my conduct and in the interests of justice, may make discerning choices as to what §3553 factors apply to me, and which do not.

9. Cases like _Johnson v. United States, id_, address the more narrow scope of supervised release termination. Although analogous, supervised release and probation are held to different standards for a good reason. Probation-only cases, meaning those that did not warrant terms of incarceration, are uncommon in the federal courts. The Bureau of Justice Statistics reports that, between October 1, 2013 and September 30, 2014, 77.6% of all federal defendants were sentenced to a term of incarceration, while only 10.7% were sentenced to probation only.[1]

10. This in itself shows that my case is an outlier in terms of federal criminal prosecutions, but points to much that was left unsaid by the government. To wit, the Sentencing Memorandum filed by the United States Attorney prior to my sentencing hearing was included in their opposition brief, but my own Sentencing Memorandum was not. I will therefore include it after the conclusion of this reply.

11. Further, cases cited by the government (e.g. _Johnson_) address §3583(e) requests, and do not constitute binding precedent in §3564(c) decisions. Again they are analogous, but are fraternal rather than identical twins.

12. To discount all that I have done during my time in supervised release as "mere compliance," is both disingenuous and offensively dismissive. [D.E. 3: 4] I spend

---

1   Federal Justice Statistics, 2014 – Statistical Tables (Table 5.1) (2017)

countless hours working, being the sole provider for my son, and a full-time caretaker for my 101-year-old grandmother who lives with us. Even while supporting both of them, I still find a way to never miss or even submit a late payment on my restitution. I included my credit score to this Court in my original motion to demonstrate that I have the drive and ability to pay off my debts, and that I have a proven history of doing just that. My restitution is no different.

13. My work is pressuring me to get free from probation. No matter if I am released now or released after it's natural expiration, my restitution will not be fully paid off. However, remaining on probation for the full duration gives me ho hope to improve my financial situation to pay it off sooner.

14. Even with all of these obligations, I still find time to volunteer hours with helping homeless men, women and children. I do this not to "look good" for this Court, but because I have a passion for it and I've been doing it for the last 8 years.

15. I would ask this Court: if my conduct before, during, and after my sentencing hearing amounts to "unexceptional," as suggested by the government's citation of _United Staets v. Laine,_ 404 F.App'x 571 (3d Cir. 2010),[2] then does nothing rise to the level of "exceptional" to opposing counsel?

16. The government never responds to the substance of my motion, and the importance of Monograph 109 remains unquestioned by either side. Other judges within this Circuit and even this district have come to contrary conclusions to the

---

2   Which, again, has no binding authority in the 11th Circuit.

government's position, as cited in my original brief. This, again was not addressed or challenged by the government.

17.  It stands to reason, then that my arguments are both valid and show that my conduct *does* warrant consideration for early release.

## CONCLUSION

If nothing constitutes exceptional conduct to the government, it stands to reason that the government does not believe in the redemptive and rehabilitative aspects that supervision is intended to achieve. I disagree with their assessment and, for the reasons stated herein, pray this Court agree and release me from the remainder of my probation.

Respectfully submitted on this *12th* day of *September* 2018.

/s/ _____

DANA ANN WILKEY
*Pro Se* Defendant, Movant

Attachments List:
- Defense Sentencing Memorandum

LAW OFFICES OF LELAND B. ALTSCHULER
Leland B. Altschuler (CA SBN 81459)
    2995 Woodside Road, Ste. 350
    Woodside, CA  94062
    650.328.7917
    650.989.4200 (Fax)
    Lee@AltschulerLaw.com
    Counsel For: Dana Wilkey, Defendant

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
(SAN JOSE VENUE)

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br><br>v.<br><br>SKYLAR PHOENIX, LISSA PHOENIX and DANA WILKEY,<br><br>     Defendants.<br>_____/ | CR No. 14-00318 LHK PSG<br><br>DANA WILKEY'S SENTENCING MEMORANDUM.<br><br>Date:  October 19, 2016<br><br>Time:  9:45 A.M. |

TABLE OF CONTENTS

Page

I. INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1

II. DISCUSSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1

    A.  U.S. SENTENCING GUIDELINES CONSIDERATIONS . . . . . . . . . . . . .   1

    B.  18 U.S.C. § 3553(a) DISCUSSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   3

        1.   The Offense Conduct Arose From A Unique Combination
            Of Conditions That Resulted In Aberrational Conduct . . . . . . . . . .   3
        2.   Ms. Wilkey Is Unlikely To Reoffend . . . . . . . . . . . . . . . . . . . . . . . .   8

III. CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   10

ATTACHMENT:
    Report by Rosemary Costa,
    (retired Senior Supervisory U.S. Probation Officer)

# I. INTRODUCTION.

By her counsel, Dana Wilkey respectfully submits this Sentencing Memorandum.

Before the Court is the well-justified PSR recommendation of a home confinement sentence that includes five years of probation supervision for Ms. Wilkey. Undersigned counsel is informed that the United States Attorney joins that recommendation.

This Sentencing Memorandum offers an additional assessment of Ms. Wilkey's offense conduct that makes a similar recommendation to the Court. We attach to this Memorandum a supporting analysis by Rosemary Costa, a retired Supervisory U.S. Probation Officer. Taken together, Ms. Wilkey respectfully submits that the § 3553(a) standard of "sufficient but not greater than necessary punishment" to achieve statutory sentencing purposes is met in this misprision case by the recommended home confinement within a term of probation, and no fine.

# II. DISCUSSION.

A.  U.S. SENTENCING GUIDELINES CONSIDERATIONS.

As between the parties, the Plea Agreement settled the computations relating to base offense level as well as downward adjustments for a misprision offense and acceptance of responsibility. Plea Agmt. at 5. As to those matters, the final PSR agrees with the approach taken. PSR ¶¶ 25-33.

The Plea Agreement left open the loss computation. Plea Agmt. at 5, fn. 1.

1    Through counsel, Ms. Wilkey lodged a timely and detailed objection to the loss

2    analysis in the draft PSR, on the overall theory that B.S.C. received work. PSR at ¶23,

3

4    ¶ 3.

5    In the PSR, the Probation Officer responded that "[i]t is "difficult to determine

6

7    the actual value of that work" provided by Adwil Agency, Inc. to B.S.C.  Further, the

8    Probation Officer noted that she would defer to the Court's determination as to the total

9    loss amount. PSR at 23, ¶¶ 3,4.

10   As for a loss adjustment, U.S.S.G. §2B1.1, provides for a 14-point adjustment for

11   any loss from $550,000 to less than $1,500,000. U.S.S.G. §2B1.1(b)(1)(H).  The 14-point

12

13   adjustment is woodenly applied across the entire $950,000 range between $550,000 and

14

15   $1,500,000. The PSR uses the 14-point adjustment. PSR, ¶ 25; page 23.

16   It is the defense position that the relevant loss range calls for a 14-point

17   adjustment, and that the loss amount is at or near $550,000. We respectfully submit that,

18

19   given the sentencing recommendations, any differences that may exist among

20   Probation, the government position, and the defense position with respect to the

21   appropriate point within that Guideline range are likely not material to the ultimate

22

23   sentencing decision by the Court.

24   As a result, given the other agreed computations, Ms. Wilkey's adjusted offense

25   level is at the very bottom Zone "B," with an adjusted offense level of 9, and a CHC of I.

26

27   We agree with the PSR that a Zone "B" sentence may be satisfied by a sentence of

28

probation that includes home detention.  PSR, ¶ 72. (The top of Zone "A" is at level 8.)

Given the PSR recommendation for home confinement, and the United States Attorney's expected joinder in that recommendation as fair and just, and our belief that a  period of home confinement is appropriate, we are prepared to submit the issue, unless the Court requires additional information or is inclined to reject the recommendations.

II.  18 U.S.C. ¶ 3553(a) DISCUSSION.

a.   The Offense Conduct Arose From A Unique Combination Of Conditions That Resulted In Aberrational Conduct.

The agreed plea disposition of a misprision of a felony (rather than a substantive fraud offense) was reached after extensive discussions with government counsel, exhaustive review and discussion of the evidence, and a willingness to calibrate the offense to the conduct and *mens rea* at issue.

No warning bells went off for Dana Wilkey when she was invited to compete for work at Blue Shield of California.  The invitation came from Skylar Phoenix, a mid-level B.S.C employee who in the past had successfully and ethically worked with Ms. Wilkey's business, Adwil Agency, Inc.  Phoenix's invitation culminated in two B.S.C. employees (a Vice President/General Manager, and a Manager) reviewing and jointly accepting the standard Adwil Agency "Master Services Agreement."  The M.S.A. was the top-level agreement that governed the commercial relationship between the ten-billion dollar a year insurance company and Ms. Wilkey's company.

1    From the day the M.S.A. was signed until this case arose, Dana Wilkey had no

2    idea that for years Skylar Phoenix had been defrauding B.S.C. through ghost employee

3    billing arrangements, including a scheme that misappropriated a variation of Ms.

4    Wilkey's business name (Adwil Agency, Inc.).[1] PSR, ¶¶ 11-15. Ms. Wilkey was stunned

5    when first informed of the originally filed charges and allegation relating to "Adwil

6    Communications". Nor did Ms. Wilkey know of other deceptions by Skylar Phoenix

7    that infected Adwil Agency's relationship with B.S.C.

8    After work on the first project for B.S.C. began, Phoenix told Ms. Wilkey that

9    Adwil Agency's path to success in working with B.S.C. was through a full-service

10   "agency model." Phoenix sent Ms. Wilkey an email confirming what "agency model"

11   treatment looked like. Exh. No. 1, filed herewith. Conveniently, Phoenix told Ms.

12   Wilkey that she, Phoenix, was just the person to fulfill that need, and could work on the

13   side for Adwil Agency.

14   Ms. Wilkey did not know B.S.C.'s internal employee policies called for

15   management to give permission for employees to moonlight.[2] Nor did Ms. Wilkey

---

[1] Skylar Phoenix knew the name of Ms. Wilkey's company, Adwil Agency, Inc. from their earlier business dealings. But as the PSR reports, and the Court may recall from other proceedings:
> However, there is no evidence to suggest that Dana Wilkey was aware of the fraudulent schemes that her co-defendants engaged in, nor did she benefit from them financially.
> ——PSR at p. 25.

[2] As the PSR reports:
> BSC's internal policies indicated that not all conflicts are forbidden but all must be disclosed and assessed by management. There is no evidence to substantiate that any disclosure was made to BSC in this case. Dana Wilkey noted that her agreement with BSC authorized her to select the personnel assigned to projects she completed for BSC.
> ——PSR, ¶ 8.

1  know that years later, B.S.C. would say that if Phoenix sought permission, B.S.C. would

2  have been denied it.

3        What Ms. Wilkey <u>did</u> know was that Skylar Phoenix represented that B.S.C.

4

5  knew of, and permitted, the arrangement.[3]  And as far as Ms. Wilkey was concerned,

6  Skylar Phoenix was the face of B.S.C.  Ms. Wilkey also knew that:

7

8     (1)   Adwil Agency could timely meet B.S.C.'s commercial needs [this is borne out
            by the fact, summarized in Exh. No. 2 and detailed in Exh. No. 3. that seven

9           different B.S.C. officers and employees *other than Phoenix* issued more than 20
            descriptions for work ("Statements of Work" or "SOW's") and follow-on

10          orders, or enhancements];

11

12    (2)   That as summarized in Exh. No. 3  (and detailed in Exh. No. 4), all the SOW's
            granted B.S.C. broad rights of acceptance before B.S.C. would pay Adwil

13          Agency (which meant that if the delivered work displeased the person or

14          business unit that ordered it, then B.S.C. could cut off Adwil Agency);[4]

15    (3)   That of the approximately $870,000 in work authorized by B.S.C. employees

16          and officers *other* than Phoenix, more than half the dollar volume consisted of
            reorders, enhancements, or other follow-on requests (which meant that at the

17          time work was originally delivered, it presumably met the business needs

18          and budget of the originating business unit);

19    (4)   That as far as she knew at the time, Ms. Wilkey successfully resolved every

20

21  _____

    [3] Significantly, Skylar Phoenix told Dana Wilkey essentially the same thing that Phoenix told the F.B.I.

22  Phoenix's statement to the F.B.I. formed the basis of the § 1001 charge against Phoenix – that Phoenix
    falsely said that was working an outside job. If the Grand Jury found probable cause to believe Phoenix

23  would lie the F.B.I., what reason is there to believe Phoenix would not lie about this very matter to Dana
    Wilkey? The gravamen of the § 1001 charge is Phoenix's statement that:

24          . . . (2) she had told her B.S.C. supervisors that she was working an "outside job" with Adwil
            Agency during the same time as Adwil Agency was performing its contract with B.S.C., knowing

25          at the time she made these statements that they were false. . . .
            —Ind., Count 14, ¶37.

26
    [4] Exhibit No. 3 describes each of the available SOWS and uses a letter to identify which B.S.C. acceptance
27  of deliverables clause appears in the SOW. All the B.S.C. acceptance clauses seem commercially
    reasonable.
28     Exhibit No. 4 provides the full text of the acceptance clauses stated in Exh. No. 3.

1   question or concern that came to her about the products and services
2   provided by Adwil Agency to B.S.C.; and

3   (5)   That the Phoenix invoices for "agency model" services Phoenix claimed she
4         provided appeared reasonable – over time, the invoices varied in amount and
5         were not always the identical percentage of the amount of money Adwil
6         Agency charged B.S.C. The invoices were general, but so were the invoices
          Ms. Wilkey received from her other small business vendors.

7         Significantly, there is simply no evidence that Ms. Wilkey ever attempted to

8   conceal any part of the arrangement that Phoenix assured her (Ms. Wilkey) was
9
10  allowed.  Ms. Wilkey believed, incorrectly and with naiveté, that what she was doing
11
    was allowed.
12
          Apart from the above, additional reason to conclude Ms. Wilkey lacked the *mens*
13
14  *rea* to cheat B.S.C. is Ms. Wilkey made the same above–board arrangements with
15
    Phoenix as she did with her other vendors: requesting a Form W-9,[5] providing her
16
17  C.P.A. with Phoenix's invoices; directing the C.P.A. to pay the invoices by check; and
18  directing the C.P.A. issue a true and correct Form 1099 to Phoenix and file it with the
19
    I.R.S.
20
          To her everlasting regret, Ms. Wilkey trusted Phoenix's words.  Ms. Wilkey well
21
22  understands the reason she stands before the Court is that she ignored what she should
23  not have ignored, and failed to verify assurances she should have verified, and failed to
24
25  report Phoenix to responsible officials.

26  _____

27  [5] Discovery produced in this case revealed that the Form W-9 Phoenix sent to Ms. Wilkey bore a fax
    tattletale showing it was sent from a B.S.C. fax machine.  Discovery also revealed that Phoenix requested
28  at least one check be sent to her at B.S.C.

1        Placing in context Ms. Wilkey's misplaced trust, the PSR reveals this case is not

2 the first time that Dana Wilkey has trusted others to her detriment.  PSR, ¶ 48 (trusting

3 employer's assurances); ¶ 49 (ex-husband); ¶ 50 (infidelity by the father of her child);

4 ¶ 51 ("Airship" investment with father of her child, which resulted in the uncollected

5 and perhaps uncollectible default fraud judgment against him for $224,986);  the family

6 matter described at ¶ 52 (final two sentences); and Costa PSR at 3, ¶ 4 ("Ms. Wilkey has

7 a history of serious misplaced trust issues").

8        Ms. Wilkey is hopeful that after this case ends, for the rest of her life she will

9 apply the lessons learned here, striking the right balance between caring trust and

10 careful self-protection. She understands she has the opportunity to reap the benefit of a

11 supportive family and rewards of participating in her community and with thought can

12 avoid more bitter disappointment.

13        The Court might be concerned about what did Dana Wilkey think she was

14 paying Skylar Phoenix to do.  Ms. Wilkey's statements in the Plea Agreement help

15 answer that question:

16     (1)    Skylar represented to me that she was doing work on the Adwil/BSC
marketing projects that was [sic] outside of her role at BSC, and effectively she
was serving as the 'project manager' of the account on behalf of Adwil.  I
failed to make any attempt to independently confirm her statement with
others at BSC or Adwil, and I should have.  Instead, I paid her as a consultant
(Plea Agmt. at 3:13-18);

17     (2)    I was aware that Skylar Phoenix was searching for additional business projects
for me within BSC.  I knew that based on her knowledge of BSC, she would be
able to identify budgets that still had funds available that would result in

profitable projects for me.  I knew that Skylar expected to be paid  by me for her role in any BSC work awarded that she worked on, and I understood that she would work on every project. Plea Agmt. at 3:19-23.

In addition, Ms. Wilkey was responsible for high-level business issues, such as: negotiating and managing relationships with outside service providers including web-hosting, insurance, and copy writing services that related to work for B.S.C.; getting involved with (and resolving concerns) around scheduling and deliverables with (or between) B.S.C. and her vendors and others; working with Adwil Agency's professional service providers such as it's C.P.A.'s and attorneys; and the host of other issues that consumes time every day for a small business owner.

b.  Ms. Wilkey Is Unlikely To Reoffend.

As the PSR notes, for more than 20 years Dana Wilkey has led a law-abiding life ('. . . the defendant has led a law abiding lifestyle and [that] a significant custodial sentence is not warranted to promote respect for the law in this case."). PSR "Justification" at 24. The Probation Officer also notes Ms. Wilkey is remorseful ("Additionally, the defendant appears remorseful. . . .  she indicated that she was "regretful" for her actions and that she ignored the fact that her friendship with the co-defendant gave her preferential treatment at BSC.") PSR at 24.

The Costa PSR is consistent:

The likelihood of Dana Wilkey re-offending is extremely low because while working with this woman, it is the enduring impression of this writer that Ms. Wilkey is truly remorseful and deeply troubled by her own behavior and wants to atone for her own involvement in the offense and that she has already been

deterred from ever engaging in similar conduct.
——Costa PSR at 8.

Dana Wilkey's 18 letters of support attached to the PSR – from her family, work and community, and friends – reveal her devoted care for her young son and longstanding care for her 99-year-old grandmother, and to her work and community, and to her friends.  Simply put, Dana Wilkey has reached the point in her life that she cannot ever risk losing custody of her son, or seeing her grandmother being placed in a nursing home. Nor can she risk her employment. The deep and important relationships developed over a lifetime is something she will not put in jeopardy.

As a result of this conviction, there is a sword hanging over Dana Wilkey's head, and that is still another reason she understands she must not reoffend.

Further, Dana Wilkey is a devoted "giver" of her time to her community, with a history of helping charitable and community endeavors that goes back approximately 20 years.  Costa PSR at 3, ¶ 6. She takes very seriously the importance of giving back, certainly in part becuase of the tragedies she has faced. Just one example of her devotion is the letter describing her hundreds of hours for the Miami Rescue Mission, written by Rev. Ronald Brummitt and supplied to the Court:

> Your Honor, in my 26 years of serving the homeless, Dana is one of the best volunteers and supporters I have met.  By the way, last year we had over 9,000 volunteers.

This conviction bars her from a host of volunteer activities in her community (particularly activities related to helping battered and abused women, a population

particularly dear to her given her own experience). The fact that bar is now in place is yet another reminder to not re-offend.

Last, but not least, for many years to come, Dana Wilkey will have a monthly reminder of the lessons learned here as she makes restitution payments to B.S.C. However much money Dana Wilkey pays every month for restitution (and we hope the Court sets a modest amount given Ms. Wilkey's limited cash flow, few liquid assets and many obligations), she will be reminded every 30 days that she must stay on the straight and narrow.

## III. CONCLUSION.

Taken singly and together, the facts of this case and the recommendations provide a substantial basis for the Court to conclude that sufficient but not greater than necessary punishment, and the goals of deterrence and protection of society, are well-achieved by the requested sentence.

Respectfully submitted,
LAW OFFICES OF LELAND B. ALTSCHULER

/ s /

By: _____
Leland B. Altschuler
Attorney for Defendant DANA WILKEY

Rosemary S. Costa, Sentencing Consultant
Costa Consulting, P.O. Box 65, Pleasanton, CA 94566
(925) 640-6576


The Honorable Lucy H. Koh
United States District Court Judge
Northern District of California
San Jose Courthouse
280 South First Street
San Jose, California 95113

Re: Dana Wilkey

Your Honor;

I respectfully offer my qualifications for preparing this report on Ms. Dana
Wilkey. I was employed by the Federal Bureau of Prisons for twelve years
attaining the position of Administrator Officer at the Western Regional Office.
I next worked for the U.S. District Court, Northern District of California for
twenty-two years, where I rose from probation officer – investigations to
guideline specialist, training officer and finally Supervisory United States
Probation Officer where I managed the San Jose investigators and later the
Oakland investigators before my retirement in 2006. I have been a sole
proprietor sentencing consultant for the past ten years consulting to federal
defense attorneys and their white collar clients.

In September 2014, I first began providing professional consulting services to
Ms. Dana Wilkey. I have had numerous telephone conversations, email
exchanges and a one-day in person meeting with her. I have spoken to
members of her family including her father, step-mother and sister. The Court
will have been provided eighteen (18) character reference letters addressed to
the Court. As Atticus Finch trenchantly observes in "To Kill a Mockingbird,"
"You never really understand a person until you consider things from his point
of view…Until you climb inside of his skin and walk around in it." The letters
provided the Court give this Court this unique vantage point. It is through
these words of support for Ms. Wilkey that the Court can gauge the true
measure of the woman. The incongruity of Ms. Wilkey's conduct when
measured against her life of good deeds and solid reputation among family,
friends, colleagues and the community is stark. Each letter demonstrates her
warmth, generosity, sincerity, tireless work ethic, genuine goodness, and
devotion as a mother and granddaughter. Ms. Wilkey has come to mean so
much to so many people. The conduct that brings her before this Court is the
very essence of aberration. Some of the authors of these letters are listed
below and they are to wit:

Rosemary S. Costa, Sentencing Consultant
Costa Consulting, P.O. Box 65, Pleasanton, CA 94566
(925) 640-6576

1.    James Wilkey – brother, "Indeed, if Dana has one true fault, it is the
      very willingness to trust, to love, to have faith in other people, that
      has made her vulnerable to the machinations of the more deceitful."

2.    James R. Wilkey Jr. – father, "She has always demonstrated a caring
      nature and devoted time to others, whether it be tutoring her younger
      siblings, beach and park cleanup or collecting for UNICEF during
      the holiday season and she has a long history of volunteer and
      charitable work in Los Angeles."

3.    Yanza M. Wilkey – step-mother, "It is her extremely strong sense of
      family, loyalty and responsibility that drives her in her dedication to
      the care of her 99-year old grandmother to whom she is her only
      living relative. She attends to her every need both physical and
      emotional. This is demonstrated by the fact that whenever she has
      had to move, she first assures herself that her grandmother will be
      comfortable and safe."

4.    Philip Marley – employer, "Dana is the hardest worker I have ever
      met, and is consistently reliable and dependable. From home, by
      telephone and the Internet, Dana has worked hard, worked
      successfully and worked seamlessly for more than two years."

5.    Lian Marcos – community (Miami Rescue Mission), "Dana started
      volunteering with us in October 2014 and has made a great impact in
      her efforts. Dana helps to tutor our residents and aid them in
      overcoming often overlooked and hidden educational deficiencies at
      our education center."

6.    Rev. Ronald Brummit – community (Miami Rescue Mission), "Your
      Honor, in my 26 years of serving the homeless, Dana is one of the
      best volunteers and supporters I have met… "By the way, last year
      we had over 9,000 volunteers."

**Summary of Observations:** Having consulted with Dana since
September, 2014, I offer the following observations:

1.    Dana Wilkey, as president of Adwil Agency located in Beverly
      Hills, California prided herself on being an astute business woman;
      however, she failed miserably in her judgment of character.

**Rosemary S. Costa, Sentencing Consultant**
**Costa Consulting, P.O. Box 65, Pleasanton, CA 94566**
**(925) 640-6576**

2.      Ms. Wilkey became a successful, self-made female entrepreneur following graduation from the University of Southern California with a degree in Political Science.

3.      Ms. Wilkey has suffered multiple personal losses in her life beginning with the separation of her parents at age four ("parents were the center of her world/universe"); on reflecting back, her parent's separation shattered her idea of relationships; at age nine, the death of the man whom she held in the highest esteem and who gave her the most unconditional love – her best friend and grandfather, succumbed to Leukemia; at age ten, the tragic death of her mother and soul mate (as a single mother she was Dana's protector, supporter, confidant and the only person upon whom she consistently relied) from an automobile accident; at age 17, a night ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓), and at age 34, the early termination of her first pregnancy due to the severe deformity (Spinal Bifida) of the fetus.

4.      Ms. Wilkey has a history of serious trust issues beginning with her business partner who jumped ship and literally left their company during the dot com crash causing Dana to lose her house, credit, and car but not her reputation; her first marriage to a movie producer who she believed was her prince charming – he broke his leg at a pool party, began taking pills to self medicate after depression set in and eventually threatened to kill her while he was high; and finally, the father of her son, John Cayden, John Flynn, who courted her, promised her the world with money and acts of love and then cheated on her  - the ensuing emotional and verbal abuse went on for five years.

5.      Dana Wilkey works full time and is the sole and devoted care provider (single parent) of a young son and an elderly grandmother.

6.      Ms. Wilkey has a lengthy record of community service work/charity events which was in part prompted by the tragic death of her mother in an automobile accident in 1985. Dating back to 1996, she was on the Board of ARIA as a publicity volunteer – this is a young professional group for the Los Angeles Opera. In 2001, she donated a website to the Benedict Canyon Association; in 2006, she hosted and sponsored the RED charity event to raise awareness for the charity; and was an ambassador host at the Monte Carlo Ball before the Grand Prix for the children of Haiti; in 2011, she obtained gift bags worth $500  for the 1736 Family Crisis Center; in 2012, she

Rosemary S. Costa, Sentencing Consultant
Costa Consulting, P.O. Box 65, Pleasanton, CA 94566
(925) 640-6576

planned an event for the Hailey Mayz Foundation which helps sick children in Orange County, California and event planned and raised items for donations for the crisis center on two other occasions; in 2014, after moving to Miami, she hosted an event for a Florida Animal Society to raise awareness for sick animals and their healthcare.

7.     On her own initiative, and within the past two years, Ms. Wilkey has performed over 197 hours of documented volunteer services tutoring homeless men at the Miami Rescue Mission, and 198 hours of informal services and support for the shelter serving food, organizing several toy drives for numerous community organizations in the Miami/Dade area and remains active in her son's elementary school Parent Teacher Association (PTA), last year performing 76 volunteer hours. All this while juggling a full time career, being the parent financially and legally responsible for her son, John, a first grader, and the home-care provider for her 99 year old grandmother.

8.     More significantly, Dana Wilkey has spent in excess of twenty hours putting together a business development plan for the operation of a food truck(s) in the Miami/Dade area which will employ homeless men who receive services from the Miami Rescue Mission.

9.     Ms. Wilkey has opined that charity work is something that makes her feel like she has really accomplished something; whereas work and money really do not fulfill her. Helping the community or helping someone that the world has given up on (homeless men at the Rescue Mission) is an accomplishment which she relishes. Her charity work runs the gamut of homeless men, to senior center; schools and local community center.

**PERSONAL HISTORY AND EDUCATION**: Dana Wilkey was born on March 1, 1973 to James Wilkey, a Navy pilot and later an IBM executive and Barbara Ann Capriole, a high school teacher.  She attests that her parents were the center of her world until age four, when her mother chose to leave her father because his work as a pilot and then executive forced a familial move every six months which challenged her mother's career choice as a school teacher.  She relates that their separation shattered her idea of relationships and this separation impacted her for many years. She remarked, "I used to always believe they would get back together."  Dana and her mother moved from a beautiful home to a small condominium while she attended public grammar school.  Her father would see her once a month on a weekend when they would participate in a fun adventure.  This she realized was an unrealistic

Rosemary S. Costa, Sentencing Consultant
Costa Consulting, P.O. Box 65, Pleasanton, CA 94566
(925) 640-6576

relationship in the real world. Dana and her mother lived very differently
from her father, as her mother struggled financially on a school teacher's
salary. The two of them were content to spend time together correcting
papers, going to the mall and exploring the surrounding parks. Dana explains,
"my mother was very perfect in whatever she did – straight A student, leader
at the University of Massachusetts, and captain of her gymnastics team."
Dana opined that she found herself always trying to emulate her but never
seemed to succeed. In the absence of a father figure/role model, she sought
out her maternal grandfather. She and her grandfather were very close – she
describes him as a best friend who took care of her everyday after school. She
professed, "He was the best man I ever knew, one of the few to this day that
mastered unconditional love." Their favorite activity together was to play
handball and talk. When she was nine, her grandfather was diagnosed with
Leukemia and died shortly thereafter. Prior to his death, unbeknownst to her,
he had folded money accompanied with love notes and hid them in Dana's
favorite places. Dana divulged that during her entire life she has aspired to
love like him.

Dana and her mother grew closer following her grandfather's death –she
describes their relationship as girlfriends in addition to mother and daughter.
Dana was ten years old; her mother for all practical purposes her only parent.
She intimates that her mother was beautiful, vibrant and lit up the room when
she walked in. She states that one cold, icy and foggy morning, her mother,
who had been trying to reconcile with her father, and was extremely upset, left
the house for school, hit black ice, lost control of her car and hit a tree. Her
mother was in a coma for a lengthy period of time and would succumb from
her traumatic brain injury two years later. She recounted her feelings, "My
mother was never going to help me again or give me advice, or show me how
to do girl/women things, go to my wedding or be made proud by me."

During her mother's stay in the long term care facility, Dana was sent to live
with her father in New York City. Her father enrolled her in a private school,
Nightingale/Banford School for Young Women. Initially, she struggled
having come from a public school. Her entrance test scores placed her at
three grade levels lower than her peer group. She was allowed to remain in
the school provided she participates in after school tutoring. Dana was
determined to excel in this environment and after two arduous years achieved
grade level parity.

However, because of a-money-losing business decision made by her father,
they moved from New York City to Greenwich, Connecticut where she was
enrolled in a public high school. It was also at this juncture that her father
remarried. Her relationship with her father and stepmother (Yanza) was
tenuous. During a verbal altercation with her father, he grabbed Dana and

Rosemary S. Costa, Sentencing Consultant
Costa Consulting, P.O. Box 65, Pleasanton, CA 94566
(925) 640-6576

shook her remarking all the while, "How dare you tell Yanza that she is the cause of our problems." Dana stated that she was genuinely frightened and managed to run out of the house to her friend's car while hearing her father yell, "don't come back because I will never take you back."

She was 15 years-old and never went back. So, during her formative teenage years when morals and ethics are taught and solidify, Dana Wilkey was left to fend for herself without parental guidance or authority figures. She was emancipated from this age forward managing to support her self through a nightclub job and staying with friend's parents who provided shelter and basic necessities. Dana sought work as a bar hostess (she over stated her age on the employment application) and managed to attend high school, finish her assigned homework, waitress from 10:30pm to 4:00 am, sleep briefly before leaving for school in the morning. After one early morning shift, she was offered a ride ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. Dana never reported this incident to the police nor discussed it with her family, maintaining this secret until now.

Upon finishing high school, Dana moved to California and over the next few years self-funded her way at several community colleges in the Los Angeles area. In 1996, she enrolled in the University of Southern California and graduated with a Bachelor of Arts in Political Science.

She worked at several technology companies, traveled the world on work assignments and became acquainted with computers and logistics. She was fortunate to have many mentors along the way who took her under their wings and trained her to be a production manager. She was able to co-produce both commercials and music videos. In 1999, she met a man, Steve Adyani, who taught her how to build websites and she, in turn, taught him how to sell them. They became a successful team; their company, Adwil (taking portions of their last names – Adyani and Wilkey) was successful for two years building websites for Spielberg, American Express, Warner Brothers, etc., before it imploded during the dot com crash. Her partner jumped ship and never came back. Ms. Wilkey opined that her word was everything. Dana was true to her word and could not let her clients down. She spent her last dollar paying everyone (consultants). She remarked that she lost everything in the crash – her house, credit, and car but not her reputation.

In 2003, after a brief engagement, Dana married a movie producer, Bret McCartney, whom she knew little about. He was her prince charming – very good looking, popular and charismatic. She professed, "I finally found true love." Dana landed a job as a Director of Marketing and Sales for Studio

Rosemary S. Costa, Sentencing Consultant
Costa Consulting, P.O. Box 65, Pleasanton, CA 94566
(925) 640-6576

Systems.  Shortly after their marriage, Bret broke his leg and began self-medicating – depression set in and he became more and more out of touch with reality.  Dana advised that he was self destructing before her – he eventually threatened to kill her.  She managed to leave him without him hurting her.

In 2004, Ms. Wilkey restarted her company, first as a sole proprietorship and then as an S corporation.  She rebranded Adwil Agency taking elements of the old company and repurposed them using the old logo.  This was done because many of her clients still had brand loyalty – it was her feeling that if she rebuilt it her clients would come.  During this time, she self taught herself event production and product placement.  In short order, her company became one of the largest companies providing event production, product placement and web development services to the entertainment industry.

It was at this juncture of her career that she met John Flynn – a self-proclaimed genius.  He courted her incessantly and slowly bit by bit, admittedly, took control over her entire life with money and acts of love through material gifts.  Together they decided to have a baby. She became pregnant but six months into the pregnancy the fetus developed a severe case of Spinal Bifida – the only option was to terminate the pregnancy because of the severity of the deformity.  Dana eventually became pregnant once again giving birth to her son, John Cayden Flynn. She says, "He is the most beautiful thing I have ever done."  Dana endured emotional and verbal abuse from John Flynn for five years.  She divulged that she did not know how to leave him which in retrospect was probably why she was so engaged with helping women and children from abusive families (since 2011, she has worked steadfastly with the family crisis centers in both California and Florida).

John Flynn asked Dana, family and friends to fund his next big project.  Dana, trying to be supportive, believed in him and invested over $230,000.00 in his scheme which then went defunct.  He essentially stole all this money because of reckless investing and his pompous ego.  John Flynn inflicted additional harm – he paid no child support; threatened to kill both Dana and son John; hacked into her Twitter and Face book social media sites and her Amazon bank account.  She opined, "I have come to terms with the fact that I am broken for choosing to be with someone like this.  I wanted so badly to believe in him.  I acted stupidly and put my family and friends in jeopardy."  She further professes, "I will always dream about having a mom that would come to my wedding, a dad that would do anything for me, an active dad for JC (son John) and a husband that would honor and protect me…"

Rosemary S. Costa, Sentencing Consultant
Costa Consulting, P.O. Box 65, Pleasanton, CA 94566
(925) 640-6576

Dana has performed charitable work for years. Giving to others helps one feel that he/she has efficacy – when one realizes he/she is making a difference in someone's life it feels good. Charitable works provide meaning and purpose to one's life. I believe her outreach to those in need makes her feel good, especially when she is thanked or reinforced in some way for doing so. She states, "Charity work is something that makes me feel like I really accomplish something, work and money don't really do it for me."

**ASSESSMENT**: In numerous conversations with Ms. Wilkey since September 2014, it is evident to this writer that she has been on quite a journey since the tragic death of her mother in July 1985. Dana Wilkey acknowledged she is quite spent – drained, yet has the moral, ethical, financial and legal responsibility of caring for a son and an elderly grandmother – both of whom are the loves of her life.

It appears that this offense arose because Dana, in her naivety, did not perform due diligence and lacked the perspective and knowledge of Blue Shield policies, its internal ethics/conflict and vendor specific policies.

1.  Dana lacked the experience to realize the need to verify the truth and accuracy of her co-defendant's statement, in part because Ms. Wilkey had a blind spot around trust issues when the co-defendant assured her (as the codefendant had assured the FBI ) that her moonlighting was permissible.

2.  Dana lacked the business judgment to see the issues that arose when working for Blue Shield and paying her co-defendant.

3.  Dana Wilkey possessed a "Go it alone attitude" which she developed from her teenage years, and the very real need for self-reliance (developed from failed relationships) made her blind to seeking help to assess any possible risk from doing business with Blue Shield and her codefendant. Ms. Wilkey did not conceive, invent or initiate her wrongdoing – this was all accomplished by her co-defendant, a Blue Shield manager.

The likelihood of Dana Wilkey re-offending is extremely low because while working with this woman, it is the enduring impression of this writer that Ms. Wilkey is truly remorseful and deeply troubled by her own behavior and wants to atone for her involvement in the offense and that she has already been deterred from ever engaging in similar conduct. Her behavior in the instant offense has totally rocked her moral compass.

Ms. Wilkey has been severely affected by the events and the aftermath of her self surrender to the FBI – she is a sincere, loving, and intelligent idealist who has been tested in various ways since June 2014. She has learned a great

Rosemary S. Costa, Sentencing Consultant
Costa Consulting, P.O. Box 65, Pleasanton, CA 94566
(925) 640-6576

many deep and painful lessons about herself (lack of self esteem, too trusting, and wanting to be everyone's protector) and others – and is the first to admit she is a poor judge of character.

1. Dana Wilkey has learned life lessons about caution, it's too good to be true, and the urge to resist temptation; all from the time she began supporting herself as a teenager – she has developed that "indomitable spirit" to go it alone.

2. For Dana Wilkey, this once in a lifetime or perfect storm experience occurred for a person with trust issues; and to come into business contact with a scammer operating a criminal scheme against a major healthcare business.

3. Ms. Wilkey has no criminal history and given her age, moral compass and care-provider responsibilities, there is an extreme unlikelihood of her re-offending.

As previously iterated, Ms. Wilkey has been severely affected by the events and the aftermath of her surrender to the FBI – she is a sincere, loving, and an intelligent idealist who has been tested in various ways since June 2014. She has learned a great many deep and painful lessons about herself (lack of self esteem, too trusting, and wanting to be everyone's protector) and others – she admits that she is a poor judge of character. Although the aftermath of this Indictment and everything else that has happened (moving from California to Florida to facilitate her career and then moving once again within Florida because of her concern/fear for both her and her son's safety in view of threats made by John Flynn) could have shattered her spirit, destroyed her faith in people and caused her to lose her career directions, I believe her strength and spirit will survive.

All of these factors have created unimaginable stress coupled with the uncertainty of final resolution in this two year plus case. She will continue to be a model mother and granddaughter, a successful business woman, a staunch supporter of the under served and abused, and a productive, contributing and responsible member of society.

Further, in this writer's opinion, Ms. Wilkey is a selfless woman who wants nothing more than to work hard, support her young son and elderly grandmother, continue to serve her community of Miami Beach, son's grammar school, the Miami Rescue Mission, and meet her obligations with the Court including payment of joint and several restitution in spite of her dire

Rosemary S. Costa, Sentencing Consultant
Costa Consulting, P.O. Box 65, Pleasanton, CA 94566
(925) 640-6536

financial condition and steep attorney fees and long drawn out child support case (five years) with John Flynn.

The Probation Officer, in her final presentence report to the Court lists the John Flynn judgment in the amount of $224,986.42 and the child support order in the amount of $43,000.00 as assets. In retrospect, the Superior Courts of the California and Florida have entered default judgments against John Flynn which will most likely go uncollected because he is in breach of the court order(s) (and in a similar government agency in the State of New York), a child support judgment against John Flynn, which also has gone uncollected despite state actions taken against his driver's license, and a lien on any of his tax refunds, and restrictions against renewal of his United Sates passport.

Therefore, this writer cannot imagine that these judgments are countable as assets. Additionally, Ms. Wilkey is responsible for a joint and several restitution order of $1,047,221.00 when in effect she earns a gross monthly income of $4,500 which covers her rent, and living expenses but not her present liabilities of $72,484.39.

Ms. Wilkey is close to negative cash flow. She has the John Flynn judgments which as stated will likely be uncollectible plus the restitution. Dana has expended much time and resources in seeking, obtaining and attempting to enforce a judgment against John Flynn for fraud in the Superior Court of the State of California in and for the County of Los Angeles and sought, obtained, and attempted with the help of Child Support Services in the State of Florida And to date, John Flynn has continued to breach all court orders. She is a unique and talented woman with demonstrated potential to do good things for herself, family and community in the coming years as she has since prior to this Indictment.

And in conclusion, Ms. Dana Wilkey does, as so eloquently stated by her brother, James, have one true fault, the willingness to trust, and to have faith in other people that have made her vulnerable to the machinations of the more deceitful.

The co-defendant introduced Dana Wilkey to Blue Shield of California. At the time of the introduction, and until the time charges were returned, Ms. Wilkey states she had no idea that her co-defendant was using a variation of her company's name (that is, "Adwil Communications"). She had no idea that the co-defendant was using the name "Adwil Communications" to defraud Blue Shield through a ghost employee scheme either. The Plea Agreement indicates that Ms. Wilkey had no direct or indirect connection with Adwil Communications.

Rosemary S. Costa, Sentencing Consultant
Costa Consulting, P.O. Box 65, Pleasanton, CA 94566
(925) 640-6576

Ms. Wilkey advised that she used the same Master Services Agreement
(MSA) with Blue Shield as with the other customers that were not closely-
regulated multi-billion-dollar businesses with expectations that arrangements
between vendors and employees had to be preapproved.  She remarked that
she believes that on her merits she won approval for her MSA from two Blue
Shield officers who exercised their independent judgment of her ability to
service Blue Shield's needs.

Ms. Wilkey reports that from her perspective, Blue Shield employees
considered the quality of her performance and deliverables more than
satisfactory and the fact is services were ordered and re-ordered, multiple
people other than her codefendant signed the Statements of Work; and money
came out of multiple budgets.

Ms.Wilkey further states that she was unaware of Blue Shield internal policies
re: employee code of conduct and was never provided anything that told her
what her codefendant claimed was untrue.  In a similar vein, she states that
she was not aware that while she was cognizant that the co- defendant had
some influence in cost increases and extensions, she did not know that the co-
defendant was acting improperly or violating any Blue Shield policies.

Moreover, Ms. Wilkey reports that if and when there were complaints, she
addressed them, and Blue Shield then accepted the goods.

She further states that she believed the co-defendant's assurances about
having permission to work for Adwil.

This writer has not been informed of any evidence that Ms. Wilkey ever
certified falsely any information provided to Blue Shield, and in particular
never certified the presence/absence of any incongruities as a vendor.

**RECOMMENDATION:**

When all is said and done, the Government and the probation officer are in
agreement of a recommendation for final disposition for Ms. Wilkey of five
years probation and as a condition of probation that Dana participates in a
Location Monitoring Program for a period of six (6) months. Additionally,
that she participates in a mental health treatment program and pay restitution
in the amount of $1,047,221.00 to Blue Shield.

This joint sentencing recommendation is appropriate because the sentence
herein crafted is "sufficient but not greater than necessary." Her Misprision
conviction equates to a lifetime of shame; there are collateral consequences of

Rosemary S. Costa, Sentencing Consultant
Costa Consulting, P.O. Box 65, Pleasanton, CA 94566
(925) 640-6576

far reaching effects including limited career opportunities (her public image in technology and the entertainment industry has been so badly tarnished that she will never be able to return to such a lucrative career) and huge financial implications and loss of certain licenses and inability to hold elected office.

**The reality of a federal conviction is – the damage is often forever.**

This writer would implore the Court to consider including in it's Statement of Reasons that the Court will entertain an early termination of probation pursuant to 18 U.S.C. section 3564(c) provided Ms. Wilkey has complied with all of her conditions including regular restitution payments and participation in mental health counseling to address her still unresolved grief, loss and trust issues.

And finally, Ms. Wilkey has created a community for her young son and elderly grandmother in Florida; is involved in her son's school community and is a trusted volunteer at the Miami Rescue Mission. She respectfully asks the Court to expedite transfer of both supervision and jurisdiction to the Southern District of Florida.

Respectfully submitted,

Rosemary S. Costa
Retired Supervisory U.S. Probation Officer
Sentencing Consultant

October 11, 2016

**Rosemary S. Costa, Sentencing Consultant**
**Costa Consulting, P.O. Box 65, Pleasanton, CA 94566**
**(925) 640-6576**

far reaching effects including limited career opportunities (her public image in technology and the entertainment industry has been so badly tarnished that she will never be able to return to such a lucrative career) and huge financial implications and loss of certain licenses and inability to hold elected office.

**The reality of a federal conviction is – the damage is often forever.**

This writer would implore the Court to consider including in it's Statement of Reasons that the Court will entertain an early termination of probation pursuant to 18 U.S.C. section 3564(c) provided Ms. Wilkey has complied with all of her conditions including regular restitution payments and participation in mental health counseling to address her still unresolved grief, loss and trust issues.

And finally, Ms. Wilkey has created a community for her young son and elderly grandmother in Florida; is involved in her son's school community and is a trusted volunteer at the Miami Rescue Mission. She respectfully asks the Court to expedite transfer of both supervision and jurisdiction to the Southern District of Florida.

Respectfully submitted,

*Rosemary S Costa*

Rosemary S. Costa
Retired Supervisory U.S. Probation Officer
Sentencing Consultant

October 11, 2016

*CERTIFICATE OF SERVICE*

I, Leland B. Altschuler, am a member of the State Bar of California and admitted to practice in the Northern District of California. I state that on this date, through the ECF system, I caused a copy of the within

DANA WILKEY SENTENCING MEMORANDUM;

EXHIBIT LIST IN SUPPORT OF DANA WILKEY'S SENTENCING MEMORANDUM And SUPPORTING EXHIBITS

to be provided to:

- AUSA Amie Rooney at the Office of the United States Attorney, 150 Almaden Boulevard, Ste. 900, San Jose, CA 95113, California,

and provided a copy by email to Emily_Libby@canp.uscourts.gov for the attention of USPO Specialist Emily Libby.

Dated: October 12, 2016.

/ s /

_____

Leland B. Altschuler

LAW OFFICES OF LELAND B. ALTSCHULER
Leland B. Altschuler (CA SBN 81459)
    2995 Woodside Road, Ste. 350
    Woodside, CA  94062
    650.328.7917
    650.989.4200 (Fax)
    Lee@AltschulerLaw.com
    Counsel For: Dana Wilkey, Defendant


UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
(SAN JOSE VENUE)


| | |
|---|---|
| UNITED STATES OF AMERICA, <br> Plaintiff, <br><br> v. <br><br> SKYLAR PHOENIX, LISSA PHOENIX and DANA WILKEY, <br><br> Defendants. <br> ———————————————/ | CR No. 14-00318 LHK PSG <br><br> EXHIBIT LIST IN SUPPORT OF DANA WILKEY'S SENTENCING MEMORANDUM AND SUPPORTING EXHIBITS. <br><br> Date:  October 19, 2016 <br><br> Time:  9:45 A.M. |


                                                                                         Page

EXHIBIT 1:   Email from Skylar Phoenix to Dana Wilkey          1

EXHIBIT 2:   Summary of BSC SOW's Issued To Adwil Agency, Inc.    3

EXHIBIT 3:   Excerpts from BSC SOW's Issued To Adwil Agency, Inc.    5

1

EXHIBIT 4:    Summary of BSC Acceptance Terms In  Issued
2                         To Adwil Agency, Inc.                                                    19

3

4       October 12, 2016.

5                                                        Respectfully submitted,

6
                                                         LAW OFFICES OF LELAND B. ALTSCHULER
7

8                                                                    / s /
                                                         By: _____
9
                                                              Leland B. Altschuler
10                                                            Attorney for Defendant DANA WILKEY

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 1

\> 
\> 
\> 

\> From: phoenixtripmom@comcast.net [mailto:phoenixtripmom@comcast.net]
\> Sent: Monday, June 25, 2007 11:55 AM
\> To: wilkey@adwil.tv
\> Subject: Pending project - please respond ASAP
\> 
\> 
\> 
\> Hi Dana
\> 
\> I spent time today with Heather regardign the pending project.  Here's
\> her concern, is that your proposal missed the mark on agency delivery.
\> The question they have is can you work and deliver like an agency for
\> the same amount.  When we work with an agency model, the agency is to
\> deliver ideas on the expierience, create the messaging and copy for
\> them from either source material, from dialogue with them or through
\> interviews with subject matter experts conducted by the agency team.
\> The agency would then present suggested copy for us to comment on.
\> They agency would be accoutnable for delivering allt he work that you listed as BSC to provide in your proposal.
\> They aren't looking to provide you everythign and for you to just
\> build the project based on their specs.  That was the initial question
\> I asked before I suggested you for the work.  Can you work like a
\> typical agency where we would just sit and talk about an idea then
\> it's the agency job to bring the ful thing to life.  Thsi would be
\> unlike the micro sites where we say here's the copy and now you just
\> build it based on our template style.  I explained to Heather what
\> we've done on the micro sites and that you probably modeled this
\> project based on that design.  Heather said that Dana or Susie was to call you and ask these questions.  I'm not sure if
that happened or not.
\> I'm meeting with Heather tomorrow all day, so I'll need to know if you
\> have had dialogue with her team, whether you can work like a typical
\> agency on this project and whether you can do it for the same cost.
\> The other vendor she has orginally came in at 21K and then dropped
\> their cost by 5K to get the project.  At this point the 5K isn't a
\> factor in the equation.  It's a question of your ability to service the project the way they were expecting.
\> If you can then you'll need to decide whether it severly impacts the
\> cost or not .  Call me if you want to dicuss.  I'm in meetings til 5
\> today then will be available thereafter.
\> 
\> Skylar
\> 
\>

# EXHIBIT 2

## SOW SUMMARY

1. **Non-Phoenix SOWs (**SOW's authorized by BSC employees other than Phoenix):

   - SOW Nos.  4; 7b; 8 (Amendment); 9; 10; 11; Amendment to 11; 12, 13, 15, 16, 17, 18, 19, 21, 22, 23, 24, A25, 26, 27, 28, 29  (M.S.A. not included).

   - Number of BSC employees authorizing non-Phoenix SOW's or SOW Amendments: Seven (C. Amador,; D. Biehn, J. Mathews;  D. Joyner, J. Moray, H. Hawker,T. Mccaferry.)

   - Approximate dollar value of non-Phoenix SOW's: $870,4863.

   - Number of non-Phoenix SOW's that were reorders, enhancements, requisitioned additional work or otherwise endorsed previous work: 14.

   - Dollar value of non-Phoenix SOW's that were reorders, enhancements or requisitioned additional work:  $473,505.

2. **Phoenix SOWs (**SOW's issued by Phoenix):

   - SOW Nos. 3, 5, 6, 7a, 8, 14, 20. (Phoenix did not sign amendments on SOW No. 8, 11 or 25). SOW No. 25 (by Phoenix) is excluded.[1]

   - Dollar value of Phoenix-authorized SOW's: $279,625.

   - Number of Phoenix-authorized SOW's that were reorders, enhancements, or called for additional work: 4.

   - Dollar value of reorders, enhancements and additional work: $156,875.

---

[1] SOW No. 25 contained no authorized maximum price, but set a $130/hour rate for  work. The Amendment to SOW No. 25 ( by J. Moray) set the maximum cost.

# EXHIBIT 3

**NOTE**:

This Exhibit summarizes information for the available B.S.C. SOW's. The first part of this Exhibit provides identifiers relating the SOW, as follows:

SOW number; B.S.C. employee or officer authorizing the SOW; date appearing by the employee's name; spending amount authorized; and whether the SOW was a reorder / follow-on or enhancement of previous work (yes or no).

Also, within the summary section, a letter identifies the form of any acceptance rights that the SOW granted to B.S.C. (e.g., "Acceptance Rights: A").

Exhibit No. 4, *post*, provides the text of the referenced Acceptance Rights paragraph

Following the summary information about the SOW, this Exhibit provides a partial extract of the work ordered.

[SOW No. 1 unavailable.]

[SOW No. 2 unavailable.]

SOW No. 3, by **S. Phoenix** [September 20, 2006/$41,200/not a Reorder or Enhancement; BSC Acceptance Rights: E.]

> Description of Work: Develop three employer-specific websites for General Electric, Stanford University, and a third employer website TBD by BSC. Each employer-specific website will include  the following services:
>
> > 2. . . . .  Adwil will write documentation of all BSC requirements for development. . . 5. Testing: conduct quality assurance testing to ensure site performance, correction connection on links, and pages load appropriately [and ] make corrections/edits to design and content prior to launch based on BSC requests. . . .  6. [M]ainteninance – Adwil will provide eight (8) hours of site updates based on BSC requests once the site is launched. . . .

SOW No. 4 [marked as "draft" and signed by Wilkey] refers to **C. Amador,** LGBU as BSC representative [undated/$80,000/ Reorder/Enhancement; BSC Acceptance Rights: Version C.]

> [Relating to COHC Tool, HDR Tool]
>
> Background: Phase 1 helped producers and their clients understand the utilization trends of healthcare by their employees.  This phase positions BSC as a leading voice on healthcare costs issues.  . . .
>
> The COHC website project, [sic] adds an additional sitelet to the HDR site that provides content and information via white papers, seminars (webcasts and podcasts) newsletters, and articles. Adwil who developed the HDR site is asked to add the additional COHC site components defined in the Adwil SOW. . .

Scope of Work: BSC desires to commence Phase 2 Development of the Health Data Reporting Tool website to fulfill its internal requirements for BSC's Cost of Healthcare  (COHC) initiative . . .

Services to be Provided:  Adwil will provide development services of 11 major modules to this project . . .

SOW No. 5, by **S. Phoenix** [October 26, 2007/$58,000/ Reorder or Enhancement; BSC Acceptance Rights: D.]

Services: . . . Development of Custom Employer site for the following[:] PG & E, Federal Employee Program, County of Orange and Daughters of Charity . . . Update the Content of General Electric, Stanford, San Francisco Health Services. . . conduct quality assurance testing to ensure site performance, correct connection on links and pages load appropriately . . [m]ake corrects/edits to design and content based on BSC need. Costs include one round of copy edits. . . Programming for additional rounds of copy edits pr development of new sections or pages after initial build at the rate of $125 per hour.

SOW No. 6, by **S. Phoenix** [January 7, 2008/$15,500/ Reorder or Enhancement BSC; Acceptance Rights: D.]

Consultant management of Web Ex account fees 40 hours at $125 per hour November 1 2007 – June 13 2008 (includes support during free period) . . . . Services: Support Blue Shield as a technical consultant with Web Ex and its technology . . . .Train Blue Shield staff on Web Ex technology… Monitor custom COHC technology to ensure it functions properly with Webex functionality. . . .Consultant will be online to monitor sessions up to 12 (1 hour) meetings. . .

SOW No. 7(a), by **S. Phoenix** [February 26 2008/$81,000/ Reorder or Enhancement; BSC Acceptance Rights: D.]

Develop a custom employer site for TriNet: work with marketing team to determine site layout based on client content. Create visual design to match BSC micro site template. Design multiple pages following approved layout. Perform HTML coding on each site page. Coordinate links to blueshieldca.com and client site. Link Adwil IP addresses to BSC vanity URls. Conduct quality assurance testing to ensure site performance,

correct connection on links and pages load appropriately.  Make corrections/edits to design and content prior to launch based on BSC need. Load micro sites on BSC rented servers with Adwil." * * * "Develop a content management and publishing interface for the following existing customer sites that meets the BSC Requirements Specification document dated February 8, 2008, which is attached hereto and referenced San Francisco Health Service System, County of Orange, Daughters of Charity, Tri Net" * * * "Develop a custom poll tool that meets the BSC Requirements Specification document . . .

SOW No. 7(b), by **(Signed Copy Unavailable)** [May 11, 2009/$20,000/ Not a Reorder or Enhancement; BSC Acceptance Rights: D.]

Consultant shall provide the following Services, including any related Deliverables: conduct (handling) 60 minute entertainment performance by Larry Miller at the Blue Shield Broker Advisory Council Meeting on June 4, 2009. ... Miller to Attend Blueshield event dinner starting at 7:00 p.m. Miller to meet Blue Shield guests and autograph 60 of his books immediately following performance…

SOW No. 8, by **S. Phoenix.** Amendment approved by **D. Biehn,** Vice President [July 9, 2008 and March 11, 2007/$73,750 and $10,000/ 8 is not a Reorder, but it includes a Reorder or Enhancement Amendment contract; BSC Acceptance Rights: A.]

[YOY Tool]

Services: . . .  Development of the report data base solution. The system will have the ability to import data from Excel XML format spreadsheets (with multiple worksheets) into an SQL database where the data can then be analyzed and compared with previous year's data.  Resulting data comparisons will then be output in various YOY report formats . . . Provide override functionality to alter the programmed data and hard key data changes in the TOOL on the summary slide. . .  Work with marketing team to determine YOY report design visual. . . Work with underwriting team to understand how rates and factors are calculated . . Work with marketing and the underwriting team to identify best graphing for inclusion and then create . . .Conduct quality assurance testing to ensure site performance, report data calculates correctly and data and graphics

load appropriately . . . Development of a training manual and two training sessions for BSC . . .

Amendment 1 by **D. Biehn**, Vice President [calls for modifications to "Tabs" as "directed and specified by BSC that have been completed"] Manage Reports Tab, Manage Clients Tab, Manage Users Tab, Login Page…

SOW No. 9, by **J. Mathews**, Director of Marketing LPS [December 18, 2008/$96,000/ Not a Reorder or Enhancement; BSC Acceptance Rights: A.]

Services: Work and meet with BSC project managers to drive the development of the 2009 mid/large internet marketing strategy for brokers and employers. This includes attendance and or leadership at key meetings. Conduct competitive research for developing internet marketing strategy. Develop 2009 internet marketing strategy for brokers and employers to support consultative selling and present a final plan including content strategy for BSC's broker and employer websites, electronic campaign strategy and supporting sales tools.  Develop tactical communications plan for execution of internet marketing strategy across all constituents: broker, employers and sales. Develop project briefs for tactical plan components with input from project owners . . Implement the internet marketing strategy and its tactical plan components . . . ongoing project management for website content maintenance on BSCs broker and employer portals up  to 10 hours per week

SOW No. 10, by **D. Biehn**, Vice President [April 13, 2009/$45,000/ Not a Reorder or Enhancement; BSC Acceptance Rights: A.]

Services: Co-develop with marketing team to determine site layout based on employer group and BSC content. …Design multiple pages following approved layout. Perform HTML coding on each site page. Develop a content management and publishing interface. . . . Conduct quality assurance testing to ensure site performance based on Industry loading standards, accurate links and pages load appropriately. Make corrections/ edits to design and content prior to launch based on BSC request …

CSAC-EIA - meets technical specifications defined in requirements documentation as outlined in Schedule 1 and passes quality assurance

testing by BSC marketing and IT teams. Sites shall meet the content and navigation requirements . . . .

SISC - meets specifications defined in requirements documentation as outlined in Schedule 1 and passes quality assurance testing by BSC marketing and IT teams. Sites shall meet the content and navigation requirements . . .

24 Hour Fitness - meets specifications defined in requirements documentation as outlined in Schedule 1 and passes quality assurance testing by BSC marketing and IT teams. Sites shall meet the content and navigation requirements . . .

SOW No. 11, by **D. Joyner,** Senior Vice President and Amendment 11 by **D. Joyner,** Senior Vice President [June 19, 2009 and September 15, 2009 / $10,160 and $20,320. SOW No. 11 is not a Reorder, but Amendment 11 is a Reorder or Enhancement; BSC Acceptance Rights: A.

Services: Development and distribution of sixteen (16) html emails. Populating the CI email alert template provided by BSC's "Shield Market Edge" with the approved BSC content and programming it into HTML . . .Tracking the performance of each email (Email Open Rate and Click-through Rate) . . . Provide BSC with Email Open Rate and Click-through Rate report with final results on each email 7-days after the initial email was delivered. May 11 2009 – August 11 2009."

[Amendment 11 – "32 (more) html emails" and report tracking. "(Service period: May 11 2009- November 13 2009"].

SOW No. 12, by **D. Joyner**, Senior Vice President [August 3, 2009 / $54,400 Not a Reorder or Enhancement; BSC Acceptance Rights: A.]

New Producer Connection & Employer Connection product pages that support the July 2009 product cycle - New product pages are made in Teamsite (BSC's web publishing tool.) Pages are tested and approved by the Large Group Product Mgr, the Marketing Product Cycle Mgr and BSC IT. Healthcare Advocate product pages, Lifepath Resources – wellness product pages, Electronic enrollment capabilities pages (includes Quick Enroll, Benetrac and EDI), Midmarket Wellness product, Minute Clinics – network options page, Group Administration Guide pages, Retiree

product suite pages, Mental health benefit changes – pages to describe mandated coverage changes. . .Medicare product pages.

Services:  Work and meet with BSC marketing project managers to drive the development of email marking campaigns . . . [Deliverables:] E-Mail marketing campaign that promotes and increases consideration of BSC Large Group and specialty benefits products . . . . HTML advertisement emails to be distributed to brokers weekly via email by Consultant  . . . . Each email drives broker to campaign oriented page on Producer Connection using Teamsite. Performance report on each email open and click through rate submitted to BSC marketing project manager 7 days after each distribution.

E-mail campaign to support Shield Spotlight forums . . .

Tactical execution of monthly edition of Shield Spotlight newsletter - Editorial content supports the Internet Marketing Strategy. Newsletters are developed in HTML email format and distributed to brokers and sales via email by Consultant.

Producer & Employer Connection content maintenance - Internet content requests are processed within 10 days; new website pages and content changes are made in Teamsite and tested and approved by BSC IT." (July 28, 2009 to October 30, 2009)

SOW No. 13, by **D. Joyner**, Senior Vice President [October 20, 2009/$35,000 Reorder or Enhancement; BSC Acceptance Rights: A.]

Services: Create visual design to match BSC *OverAll Health* website template. Design multiple pages following approved layout.  Perform HTML coding on each site page. Develop a content management and publishing interface. . . . Conduct quality assurance testing to ensure site performance, correct connection on links and pages load appropriately. Make corrections/edits to design and content prior to launch based on BSC needs. Load Overall Health site on Consultants servers.

SOW No. 14, by **S. Phoenix** [December 9, 2009/$2,375 Reorder or Enhancement; BSC Acceptance Rights: A.]

Revised Year-Over-Year Tool report to include the modifications as described in Section 1.2 above. [There is a list detailed list of changes in a-f.]

SOW No. 15, by **D. Joyner**, Senior Vice President [November 13, 2009 / $56,900 Reorder or Enhancement; BSC Acceptance Rights: A.]

Services: Work and meet with BSC project managers to drive the development of email marketing campaigns. . . An email marketing campaign plan that promotes and increases considerations of BSC Large Group. . . .

Deliverables: Email campaign plan to support Shield Spotlight Broker forums…each email below shall be distributed Consultant per the schedule set by the Producer Program Marleting Team….2-3 event invitations per date…Pre-event reminders 2-3 days prior to each event…post event thank you / survey per event. …Post event "sorry we missed you" per event.

Email campaign support Overall Health product with accounts that purchase. Member emails listed below shall be distributed through the Overall Health Online Communications and Activity Center webs sites by the account Health Benefits Administrator (HBA). Employer reminder emails will be distributed by BSC Wellness Consultant … 2-3 member emails for each member activity to promote engagement: Wellness Assessment, Health Coach consultation, Biometric screening, Healthy Lifestyle Rewards promotion, Company Wellness Event…4-6 reminder emails to HBA's on quarterly activities.". (November 2 2009 – February 26 2010)

New Producer Connection and Employer Connection product pages that support February 2010 product cycle…Legislation page…18-20 new pages to support Mid/large 2010 product cycle…earned rewards program… integrate newsletter and announcements into Mid/Large areas.

SOW No. 16, by **D. Joyner,** Senior Vice President [January 29, 2010 / $13,275 Reorder or Enhancement; BSC Acceptance Rights: A.]

Services: Design and programming services to develop an upgraded email template tool with customization feature to work with Wellness site . . .

> Design and programming services to develop an advanced custom
> content copy manager module that allows for customization driven by
> each employer group log in. . . . A revised Overall Health Communication
> and Activity Center, Wellness site with a CMS tool.

SOW No. 17, by **J. Mathews**, Director of Marketing LPS and Amendment No. 1
by **J. Moray**, Senior Director [February 23, 2010 and September 22, 2010 / $19,500,
and total cost allowance revised to $27,300. Not a Reorder or Enhancement; BSC
Acceptance Rights: A.]

> Design and programming services to revise copy, graphics and
> navigational links on an as needed basis to bring content up to date on the
> various custom employer micro sites for the companies or entities listed
> below. [City of Orange, Pacific Gas & Electric, General Electric, Federal
> Employee Program (FEP), San Francisco Health Services System (SFHSS),
> Daughters of Charity, Stanford, TriNet, So. California Edison, Stockton,
> California State Association of Counties Excess Insurance Authority.]

SOW No. 18, by **D. Joyner**, Senior Vice President [March 11, 2010 / $30,100
Reorder or Enhancement; BSC Acceptance Rights: A.]

> Services: Create a *Shield University* micro site for select BSC brokers to
> register for the *Shield University* broker training program, receive pre-
> course work materials, information on travel to BSC headquarters for the
> training as well as provide access to *Shield University* materials and tools
> prior to and following the training program.   The site will have a Content
> Management System (CMS) and publishing interface tool that allows BSC
> the ability to change content and images on the site . . .
>
> Deliverables:  . . . .  Shield University website – meets specifications
> defined in requirements documentation and passes quality assurance
> testing by BSC marketing and IT teams.

SOW No. 19, by **D. Joyner**, Senior Vice President [March 11, 2010 / $64,500
Reorder or Enhancement; BSC Acceptance Rights: A.]

> Services:  Work and meet with BSC marketing project managers to drive
> the development of email marketing campaigns . .

Deliverables: An email marketing campaign plan that promotes and increases consideration of BSC Large Group and Specialty Benefits products . . . Each email drives broker to campaign oriented page on Producer Connection using Teamsite (BSC's web publishing tool.) Performance report on each email opened and click-through rate submitted to BSC marketing project manager within seven days after each distribution.

Email campaign plan to support Shield Spotlight Broker forums. Each email listed below shall be distributed by Consultant per the schedule set by Producer Program Marketing Team. . . .

Email campaign plan to support employer forums and Blue Card training . . .

Email campaign to support OverAll Health product with accounts that purchase product with a HRA (Health Reimbursement Account) component. . . .

New Producer Connection & Employer Connection product pages that support the July 2010 product cycle . . . . Pages are tested and approved by the Large Group Product Mgr, the Marketing Product Cycle Mgr and BSC IT . . .

Web Traffic Reports . . . Report demonstrates the site traffic on indicators defined by BSC.

Tactical execution of monthly edition of Shield Spotlight Newsletter - Editorial content supports the Internet Marketing Strategy. Newsletters are developed in HTML email format and distributed to brokers and sales via email by Consultant. Newsletter is also integrated as a page on Producer Connection using Teamsite.  All required components required completed by the end of the 2nd week of each month.

Tactical execution of bi-monthly edition of new Employer Newsletter - Editorial content supports the Internet Marketing Strategy. . . .

Producer & Employer Connection content maintenance - Internet content requests are processed within 10 days of request; new website pages and content changes are made in Teamsite and tested and approved by BSC IT." (Service period: March 1 2010 to July 16 2010).

SOW No. 20, by **S. Phoenix,** [April 27, 2010 / $7,800 Not a Reorder or Enhancement; BSC Acceptance Rights: A.]

> Design and programming services to develop Local Access + HMO network eligibility and provider look up tool….meets the program and design services requirements as described in Section 1.2 above.

SOW No. 21, by **J. Moray**, Senior Director [July 1, 2010 / $48,500 Not a Reorder or Enhancement; BSC Acceptance Rights: A.]

> Definitions: "Mesnap" shall mean [Adwil] proprietary technology that allows users to take an existing picture or a new picture of themselves through an online application with an image or object identified in the BSC campaign and share it with their social media network through social media applications. . . .

> Services: Co-develop with BSC marketing team a social media campaign that uses Mesnap . . .

> Develop Reporting Tool with administration to produce reports that extract public data . . .

> Conduct quality assurance testing to ensure site performance are within industry loading speed standards.

SOW No. 22, by **J. Moray,** Senior Director [July 7, 2010 / $64,000 Reorder or Enhancement; BSC Acceptance Rights: A.]

> Services:  Work and met with BSC marketing managers to drive the development of email marketing campaigns for the October 2010 product cycle.

> Deliverables: An email marketing plan that promotes and increases consideration of BSC Large Group and Specialty Benefits products. . . .

> Email campaign plan to support Shield Spotlight Broker forums. . . .

> Email campaign plan to support employer forums and Blue Card training . . .

* * *

New Producer Connection and Employer Connection product pages that support the October 2010 product cycle and marketing initiatives . . .

Web Traffic Reports - delivered in Excel/PDF (soft copy).  Report shall demonstrate the site traffic on indicators defined by BSC.

Tactical execution of monthly edition of Shield Spotlight Newsletter…

Tactical execution of bi-monthly edition of Shield Spotlight newsletter. . .

Producer and Employer Connection content maintenance …

(Service period: July 19, 2010- December 3 2010)

SOW No. 23, by **J. Moray**, Senior Director [September 29, 2010 /$28,500 Reorder or Enhancement; BSC Acceptance Rights: A.]

Services: Design and programming services to create a *Shield Video* micro site for members and prospective members to learn more about BSC's programs and services, what to consider when selecting a health plan and benefits of BSC coverage. The site will have a Content Management System (CMS) and publishing interface tool that allows BSC the ability to change content and images on the site independently of Consultant's site. . . .

Implement approved Shield Video micro site template design . . .

Programming services to convert three BSC FLV videos to HTML5 to support Iphone technology and web browsers. . .

Provide website analytics and tracking tools to report the following:

Number of unique visitors to landing page, Number of visits to landing page, Landing page to Video Page click through, Number of plays per video (also chapter play count), Number of stops/ exits/bounce rates, Number of clicks on "Find Out More" links, Number of shares by type, Number of glossary searches, Top 10 search terms, Number of glossary lookups.

Deliverables: Shield video website – meets expectations defined in services 1.2 above and passes quality assurance testing by BSC marketing and IT teams.

SOW No. 24, by **J. Moray**, Director of LGSB [January 21 2011 / $32,000 Reorder or Enhancement; BSC Acceptance Rights: B.]

>   Services: Work and meet with BSC marketing project managers to drive the development of email marketing campaigns . . .for the February 2011 product cycle.

>   Deliverables: Email marketing campaign plan that supports the February 2011 product cycle…." (Service period: January 1, 2011 – February 18, 2011)

>   [Description in SOW No. 24 is very similar to SOW 22, and is a reorder with expansion of services.]

SOW No. 25, by **S. Phoenix**, and **J. Moray**, Senior Director [March 7, 2011 and June 16 2011 / $9,750. The Amendment 25 increased the cost allowance to $23,400. Not a Reorder or Enhancement; BSC Acceptance Rights: B.]

>   Services: Up to 75 hours of design and programming services to revise copy, graphics and navigational links as requested. . . Open enrollment video website, Local Access Plus Network tool, Shield University Website, Shout Out for Health – social media website and integration with corporate Facebook site…County of Orange, PGE, General Electric, Federal Employee Program, San Francisco Health Services System, Daughters of Charity, Stanford, Trinet, CSAC EIA, Southern CA Edison, John Muir.

>   [Amendment 25 added "build" hours so Large Group Clients could order more work].

SOW No. 26, by **J. Moray**, Senior Director [March 7, 2011 / $19,110 Reorder or Enhancement; BSC Acceptance Rights: B.]

>   Services: Design and programming services to develop the new features listed below on the Shout Out hosted websites under each of the following five (5) categories: . . . a. Customization Feature . . .  b. Email feature . . .c. Print/Download Feature. . . d. Random Sweepstakes Winner Selection  . . . e. Custom Reporting . . .

SOW No. 27, by **J. Moray**, Senior Director [March 30, 2011 / $34,000 Reorder or Enhancement; BSC Acceptance Rights: B.]

Services: Project Management Work and meet with BSC marketing project managers to drive the development of email marketing campaigns, newsletters and new website pages to promote large group and specialty benefits products for the February 2011 product cycle . . . Email marketing campaign plan that supports the February 2011 product cycle. . . Monitoring the incoming and outgoing site traffic . . .Track and analyze digital campaign and newsletter performance

(Service period: February 21, 2011-April 29, 2011)

SOW No. 28, by **H. Hawker**, Marketing Director [September 30, 2011 / $42,400 Reorder or Enhancement; BSC Acceptance Rights: B.]

Services: Design and programming services to develop three (3) employer specific Shout Out websites . . . Conduct quality assurance testing to ensure sub-sites performance bested on industry loading standards

across all BSC site" Also included Shout Out renewal and updates, hosting.]

SOW No. 29, by **T. Mccaferry**, Vice President Calpers Division [December 16, 2011 / $15,618.00 Not a Reorder or Enhancement; BSC Acceptance Rights: B.]

Overview: Consultant to design an online urgent care center (the UCC") locator too. . . .

Services: Design and develop an online UCC locator Tool (the "Tool") to be hosted on BSC server based on UCC data provided by BSC (and) …. Provide quality assurance, review , configuration and testing of tool as required by BSC. . . . . Provide layout and design based on approved BSC copy input.

# EXHIBIT 4

**Clauses for Acceptance and Delivery:**

A. <u>Acceptance of Deliverables</u>.  Upon completion of any Deliverables Consultant shall submit such Deliverable to BSC for acceptance testing.  Final acceptance of all Deliverables shall be determined in the sole but reasonable discretion of BSC within thirty (30) days of receipt of such Deliverables; provided, however, that in the event that the parties agree upon acceptance criteria for such Deliverables in a written document signed by both parties prior to commencement of the Services ("Acceptance Criteria"), then BSC shall determine in its sole but reasonable discretion whether such Deliverables meet the Acceptance Criteria.  In the event that any Deliverable fails acceptance testing, BSC shall promptly notify Consultant and shall provide a reasonably detailed description of the reason for such failure.  Consultant shall then promptly modify such Deliverable to remedy the identified failures, at no additional cost to BSC, and shall re-submit such Deliverable to BSC for acceptance testing.

B. <u>Acceptance of Deliverables</u>.  Upon completion of any Deliverables, Consultant shall submit such Deliverable to BSC for acceptance testing.  Final acceptance of all Deliverables shall be determined in the sole but reasonable discretion of BSC within thirty (30) days of receipt of such Deliverables.  In the event that any Deliverable fails acceptance testing, BSC shall promptly notify Consultant and shall provide a reasonably detailed description of the reason for such failure. Consultant shall then promptly modify such Deliverable to remedy the identified failures, at no additional cost to BSC, and shall re-submit such Deliverable to BSC for acceptance testing within five (5) days of such notification or as otherwise agreed to in writing by BSC and Consultant.

C. BSC Project Manager (Amy Shriver) and Driver (Connie Amador) will conduct quality assurance on all deliverables to ensure they meet BSC standards and business requirements as specified herein.  BSC shall have seven (7) business days to review Deliverables to ensure that all Deliverables meet the requirements as defined within the scope of this engagement and will identify which elements of the criteria have not been met.  Thereafter, Adwil will have three (3) business days to modify the Deliverable so it will conform to the criteria and otherwise meet the requirements at no additional charge to BSC.  If Adwil fails to so conform the Deliverable, then BSC may either take it "as is" or BSC may relinquish

the Deliverables to Adwil and not be billed for the services of this SOW.
Upon approval by project manager, deliverables will be provided to
Project Owner (Skylar Phoenix) for final sign-off and approval of
deliverables for each milestone before future payments are released.

D.  Primary Review Process:  BSC will have five (5) business days from the
completion of Services to review Deliverables to ensure that the
Deliverables meet the requirements as defined within the scope of this
engagement.  BSC shall inform Consultant if a Deliverable fails to meet
the agreed-upon criteria, and shall identify which elements of the criteria
have not been met ("Primary Review Requests").  Thereafter, Consultant
shall have five (5) business days to modify the Deliverable to conform to
the Primary Review Requests.

Secondary Review Process:  BSC will have five (5) business days to review
the resubmitted Deliverable.  If Deliverable fails to conform to the Primary
Review Requests, Consultant shall have five (5) business days to modify
the Deliverable to conform to the Primary Review Requests and resubmit
to BSC for review.  This Secondary Review Process may be repeated by
BSC provided that if any subsequent rejection of the Deliverable is solely
based upon of non-compliance with the Primary Review Requests.

E.  BSC's Project manager shall be the only BSC representative authorized to
give all approvals and provide notices for acceptance and deliverables.
Upon  commencement  of work. Adwil and BSC shall agree in writing, in
advance, to a specific set of acceptance criteria for each Deliverable. Adwil
shall notify  BSC in writing when the Deliverables are completed and are
ready for BSC acceptance. BSC will have seven (7) business days to review
Deliverables to ensure that all Deliverables meet the requirements as
defined with in  the scope of the engagement. BSC will inform Adwil if a
Deliverable fails to meet the agreed-upon criteria, and will have identify
which elements of the criteria have not bee met.  Thereafter, Adwil will
have (3) business days to modify the Deliverables so that it will conform
to the criteria and otherwise meet the requirements at no additional cost to
BSC. If Adwil fails to conform the Deliverables then BSC may either take it
"as is" or BSC may relinquish the Deliverables to Adwil and not be billed
for the services of the SOW. Upon acceptance of each Deliverable, Adwil

shall bill BSC for the fees of that Deliverable which BSC will pay as described below.

CERTIFICATE OF SERVICE
FOR PRO SE DOCUMENTS

I, DANA ANN WILKEY, do hereby certify that I have served a true and correct copy of
the following document,

**DEFENDANT'S REPLY IN RE: GOVERNMENT'S
OPPOSITION TO EARLY TERMINATION
OF PROBATION [D.E. 3]**

upon the court and the office of the United States Attorney:

**ALEJANDRA L. LÓPEZ**                    **Clerk of the US District Court**
United States Attorney's Office          Southern District of Florida - Miami
99 NE 4th Street                         400 North Miami Avenue
6th Floor                                8th Floor
Miami, FL 33132-2111                     Miami, FL 33128-7716

by placing it in a sealed, postage prepaid envelope by United States Postal Mail

on the _12th_ day of _September_ 2018.


DANA ANN WILKEY
*Pro Se* Movant



EXPECTED DELIVERY DAY: 09/13/2018

USPS TRACKING NUMBER

9505 5161 5619 8255 2279 70

530 sabal palm Rd
Miami, Fl 33137

USMS INSPECTED

PRIORITY
★ MAIL ★

UNITED STATES
POSTAL SERVICE®

TRACKED
★ ★ ★
INSURED

For Domestic Use Only

Label 107R, July 2013

Clerk of the US District
Court
Southern District of
Florida - Miami
400 North Miami Avenue
8th Floor
Miami, Fl 33128 - 7716

RECD by _____
SEP 13 2018
STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. of FLA. - MIAM

U.S. POSTAGE PAID
PME
33137
SEP 11 18
AMOUNT
1006
33128
$7.25
R2305M114165-09